IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

PENNY CYPRET,                        )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      Case No.
                                     )      13-0366-CV-W-REL-SSA
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,     )
                                     )
            Defendant.               )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Penny Cypret seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Title II of the Social

Security Act ("the Act").  After reviewing plaintiff's arguments in light of the evidence,  I find

that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is

not disabled.  Therefore, plaintiff's motion for summary judgment will be denied and the

decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On October 7, 2009, plaintiff applied for disability benefits alleging that she had been

disabled since May 1, 2008, amended to February 1, 2009 (Tr. at 31).  Plaintiff's application

was denied on January 28, 2010.  On July 6, 2011, and December 9, 2011, hearings were held

before an Administrative Law Judge.  On December 20, 2011, the ALJ found that plaintiff was

not under a "disability" as defined in the Act.  On February 20, 2013, the Appeals Council

denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final

decision of the Commissioner.

## II.   STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final

decision" of the Commissioner.  The standard for judicial review by the federal district court is

whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. §

405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,

850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v.

Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the

Commissioner's decision is supported by substantial evidence requires review of the entire

record, considering the evidence in support of and in opposition to the Commissioner's

decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876

F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the

evidence in the record and apply a balancing test to evidence which is contradictory."

Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities &

Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson

v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).

However, the substantial evidence standard presupposes a zone of choice within which the

decision makers can go either way, without interference by the courts.  "[A]n administrative

decision is not subject to reversal merely because substantial evidence would have supported

an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to

return to past relevant work by reason of a medically-determinable physical or mental

impairment which has lasted or can be expected to last for a continuous period of not less than

twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return

to past relevant work because of the disability, the burden of persuasion shifts to the

Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Stella Doering, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Stipulation for Compromise Settlement

On March 11, 2005, plaintiff settled a worker's compensation claim for $12,750.00 (Tr. at 163).

## Earnings Record

The record established that plaintiff earned the following income from 1978 through 2010:

| Year | Earnings | Year | Earnings |
|------|---------|------|---------|
| 1978 | $ 630.88 | 1995 | $ 4,312.16 |
| 1979 | 2,458.24 | 1996 | 8,393.78 |
| 1980 | 226.40 | 1997 | 5,721.73 |
| 1981 | 417.69 | 1998 | 4,367.37 |
| 1982 | 735.99 | 1999 | 5,744.06 |
| 1983 | 647.91 | 2000 | 12,115.68 |
| 1984 | 0.00 | 2001 | 19,742.68 |
| 1985 | 718.57 | 2002 | 21,352.10 |
| 1986 | 51.72 | 2003 | 24,755.74 |
| 1987 | 1,771.60 | 2004 | 9,680.12 |
| 1988 | 334.16 | 2005 | 0.00 |
| 1989 | 1,914.96 | 2006 | 828.61 |
| 1990 | 5,941.62 | 2007 | 0.00 |
| 1991 | 3,568.84 | 2008 | 4,752.00 |
| 1992 | 2,523.57 | 2009 | 2,194.21 |
| 1993 | 836.66 | 2010 | 0.00 |
| 1994 | 6,813.13 | | |

(Tr. at 182).

**Daily Activities Questionnaire - Interested Third Party**

On October 25, 2009, Georgina Phillips, plaintiff's friend of 18 years, completed a Daily Activities Questionnaire (Tr. at 204-207). When asked how frequently she sees plaintiff, Ms. Phillips wrote, " a couple weeks every other month." Plaintiff spends a typical day watching television and playing on the computer (Tr. at 204). Plaintiff naps off and on all day. Plaintiff cooks a little bit but her husband makes supper because plaintiff cannot pick up a pot or pan that has anything in it. Plaintiff vacuums a couple times a week and helps her husband do the dishes. Plaintiff is able to drive to appointments. Plaintiff has problems concentrating every day: "forgetting to eat, what day of the week it is." Plaintiff starts to cry for no reason sometimes.

**Daily Activities Questionnaire - Interested Third Party**

On December 4, 2009, plaintiff's friend of 10 years, Tonya Bryan-Long, completed a Daily Activities Questionnaire (Tr. at 235-238). Ms. Bryan-Long indicated that she sees plaintiff once a month. She indicated that plaintiff is "up and down" at night and that she does not have normal sleep, that she has a hard time getting out of the tub, that plaintiff's husband does all of the cooking or they eat out, that plaintiff is able to drive, that plaintiff's hobbies include reading a lot and watching television, and that plaintiff has a hard time getting along with co-workers because she "hurts too much." Ms. Bryan-Long said, "now we hardly see each other. Talk on the phone some. . . . I miss her."

**Function Report**

In a Function Report dated December 4, 2009, plaintiff reported that she watches television for about four hours after she gets up in the morning (Tr. at 218-226). She then goes back to bed. Plaintiff "can't sleep at night" because she is restless and her back hurts. She needs help washing her hair. She needs a lift to get up from the toilet. Plaintiff eats fast food,

pizza and TV dinners. She cannot lift heavy pans or milk, and she cannot open jars. Plaintiff drives, but sometimes she is unable to step on the brakes due to knee pain and her knee "coming out of joint." Plaintiff visits with others on the phone. Her symptoms affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, use her hands and get along with others. Her symptoms do not affect her ability to talk, hear, understand, or follow instructions. Getting along with others is hard when she is in pain. Plaintiff is left-handed. She can walk for 15 minutes before needing to rest for an hour or two. She can pay attention for about an hour.

**Function Report**

In a second Function Report dated both December 29, 2009, and January 2, 2010 (about a month after the previous one), plaintiff described her day as doing nothing more than sitting and watching television or lying down, and rubbing her legs to help relieve her pain (Tr. at 257-264). Plaintiff eats only one meal a day and her husband prepares that. The only household chore she can perform is wiping off the table. She is able to drive a car and can go out alone. Plaintiff does not like to be around people because when she stands in line she starts hurting and she gets restless.

**Disability Report**

In an undated Disability Report, plaintiff indicated that she can speak, read and write in English (Tr. at 268-278). She was working at the time for a staffing company doing cleaning for 6 hours per day one day a week. She completed 9th grade, was not in special education classes, and has no additional type of specialized job training. She worked as a child care provider 8 hours a day 5 days a week from August 2008 through November 2009 earning $9.25 per hour. I note that (1) plaintiff's alleged onset date is February 1, 2009, which would mean that she worked full time for almost a year after her alleged onset date, and (2) annual

earnings at this rate would equal $19,240; however, during all of 2008 and 2009, plaintiff's earnings records show a total of $6,946.21 which indicates that if she did work as much as alleged in this Disability Report, she did not report all of her earnings.

**Work History Report**

In an undated Work History Report plaintiff indicated she worked as a child care provider until November 2009 (Tr. at 279-296). Again, this is nearly a year after her alleged onset date. The Work History Report states that in 2009 she starting doing cleaning for a staffing company and she was still employed at the time she completed this form. She did not complete any of the questions about her job duties (Tr. at 282); however, in another form when asked to describe her duties at Labor Ready she wrote, "everything" (Tr. at 317, 326).

**B.      _SUMMARY OF MEDICAL RECORDS_**

On January 20, 2006, plaintiff was evaluated by Anna Maria Bellatin, Ph.D., in connection with a previous disability case (Tr. at 388-390). This was several years before her most recent alleged onset date; however, I note a few things from this record that are relevant. Plaintiff testified at her administrative hearing that she does not have a GED (Tr. At 30), but she told Dr. Bellatin during this psychological evaluation that she earned a GED at age 18 after dropping out of school in 9th grade (Tr. At 388). Dr. Bellatin observed no impairments in walking or standing  (Tr. At 389). Dr Bellatin, at that time, found that plaintiff would have some impairment in remembering more complex instructions and may have some impairment in sustaining concentration and persistence in tasks; however, she noted no other mental impairment.

On August 23, 2007, plaintiff saw Mohammed Pourakbar, D.O., with complaints of chest pain (Tr. at 412). Plaintiff had an EKG and chest x-ray which showed early chronic obstructive pulmonary disease ("COPD") changes. She was sent to St. Mary's Medical Center

by Dr. Pourakbar for further evaluation of complaints of chest pain (Tr. at 398-399). Plaintiff was smoking a pack or more of cigarettes per day. After evaluating her chest CT and EKG, Robert Henley, M.D., determined that plaintiff's chest pain was not cardiac in nature or caused by pulmonary embolus. He assessed chest wall pain.

On February 19, 2008, plaintiff saw Dr. Herbert Lindsley, a rheumatologist, at KU Medical Center for a follow-up on fibromyalgia and generalized pain (Tr. at 443-447). Plaintiff reported that she "sleeps 8 hours at night with cyclobenzaprine [Flexeril, a muscle relaxer]." She reported moderate fatigue and joint pain. She weighed 166 pounds. She was alert, oriented and cooperative with normal mood, affect, memory, judgment and insight. She was diagnosed with polyarthralgias of the hips, feet and hands; generalized pain; fibromyalgia; low back pain; and neck pain. She was told to consider trying Lyrica. No prescriptions were provided; no follow up was recommended. "Will follow with PCP [primary care physician]."

On February 27, 2008, plaintiff went to the emergency room for treatment of a migraine headache (Tr. at 394). Plaintiff had been prescribed Imitrex but was out of it. She reported that she had not been to the hospital for the past year for a migraine. She reported no trouble walking. Plaintiff testified positive for influenza and her headache was assessed as likely caused to influenza. She was given medication in the emergency room and was given a new prescription for Imitrex.

February 1, 2009, is plaintiff's amended alleged onset date.

On March 17, 2009, plaintiff saw Dr. Lindsley, her rheumatologist, for a follow-up on fibromyalgia (Tr. at 440-443). Her last appointment had been 13 months earlier. Plaintiff stated that she had gained 40 pounds on Lyrica. She weighed 159.2 pounds on this visit; she weighed 166 pounds 13 months earlier (Tr. at 445). During that earlier visit, plaintiff indicated that she was not planning to follow up with Dr. Lindsley, that she would follow up

with her primary care physician (Tr. at 447). She was told to consider trying Lyrica; therefore, the alleged 40-pound weight gain presumably occurred during that 13-month period, yet her weight was almost 7 pounds less on this subsequent appointment. Plaintiff reported moderate pain. She reported sleeping well with cyclobenzaprine (Flexeril, a muscle relaxer). She described her pain as an 8.5 out of 10, her fatigue a 10 out of 10, and her "global" an 8 out of 10. On exam she was alert, oriented, and cooperative with normal mood, affect, memory, judgment and insight. No tender points were noted. Plaintiff was assessed with polyarthralgias of the knees and heels, fibromyalgia, generalized pain, low back pain, and chest wall pain. She was given prescriptions for gastroesophageal reflux disease ("GERD") and restless leg syndrome and was told to return in six months.

On September 15, 2009, plaintiff saw Dr. Lindsley, her rheumatologist, for a six-month follow up (436-439). Plaintiff reported no change in her condition. She said she had aches in her knees, her knees were giving out, she was having trouble walking up stairs. She reported left hip pain and neck pain for which she had begun taking Flexeril (a muscle relaxer) which "helps a lot." Plaintiff reported complete control of her GERD symptoms with Ranitidine and complete control of her restless leg syndrome with Requip. She reported her pain and fatigue both a 9 out of 10 and her "global" was a 10 out of 10, with 10 being the worst possible, unbearable, excruciating pain. The record refers to the Visual Analogue Scale:



Plaintiff said her headaches "come and go." She denied chest pain, wheezing, coughing, depression. She reported joint pain and swelling, generalized aching, muscle pain, muscle weakness, and two hours of morning stiffness. On exam she was alert, oriented, and cooperative with normal mood, affect, memory, judgment and insight. Her muscle strength was 5/5 on both arms and both legs. Her gait and station were normal. She had 16 out of 18 tender points, but all points on the diagram were marked normal except her knees. Dr. Lindsley prescribed Cyclobenzaprine (also called Flexeril, a muscle relaxer), Ultram (also called Tramadol, treats moderate to severe pain), and Orphenadrine (skeletal muscle relaxer) and told her to return in six months.

On October 7, 2009, plaintiff filed her current application for disability benefits.

On January 25, 2010, Alan Aram, Psy.D., completed a Psychiatric Review Technique after reviewing plaintiff's medical records (Tr. at 467-478). He found that plaintiff had no restriction of activities of daily living; no difficulties in maintaining social function; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. In support of his findings, Dr. Aram noted Dr. Bellatin's psychological evaluation of January 2006 and the fact that plaintiff was receiving no mental health services at that time (although Dr. Aram gave little weight to this report because it was several years before plaintiff's alleged onset date); Dr. Lindsley's evaluation dated September 15, 2009; the fact that plaintiff was not currently being treated for depression; and the fact that depression had not been mentioned as a diagnosis in plaintiff's medical records to date.

On March 1, 2010, plaintiff saw Edward Wortham, M.D., for an annual physical (Tr. at 479-483). Plaintiff had not been seen by him in almost 2 years. She reported continued back pain "which is about the same as it has always been. Was diagnosed with fibromyalgia. Also mentions that her right hip 'pops out' sometimes." Plaintiff denied fatigue (despite having

described it as very significant to Dr. Lindsley in the past), weakness, malaise, muscle cramps, muscle weakness, loss of strength, sleep disorder. She complained of shortness of breath with exertion, joint pain, back pain, stiffness, arthritis, headaches and depression. "Denies difficulty with concentration, . . . falling down, . . . memory loss. . . . anxiety, . . . mental problems. . . . cold intolerance, heat intolerance." On exam plaintiff's lungs were clear to auscultation. She had no joint swelling or tenderness. Her muscle tone and strength were normal. She was alert and cooperative with normal mood and affect, normal attention span, normal concentration. Plaintiff's same medications were continued: Tramadol and Cyclobenzaprine for fibromyalgia; Imitrex, Propranolol and Tramadol for "migraine not otherwise specified" and Requip, for restless leg syndrome.

On March 16, 2010, plaintiff was seen by Dr. Lindsley for a six-month follow up (Tr. at 495-498). Plaintiff reported doing poorly. She said she had trouble getting out of bed that morning, she was having trouble sleeping (despite having, two weeks earlier, denied sleep problems to Dr. Wortham), she was having diffuse muscle pain, knee pain, hip pain, morning stiffness, and difficulty climbing stairs. Plaintiff reported having tried Lyrica but said she stopped it because it made her gain weight (plaintiff's weight was 156 pounds). Plaintiff described her pain and fatigue both as an 8 and said she was "very dissatisfied." She was smoking 1 1/2 packs of cigarettes per day. On exam plaintiff was observed to be tearful, but alert, oriented and cooperative. She was noted to be tender to palpation on her lumbar and thoracic spine. Her lungs were clear to auscultation. All three joints of each of plaintiff's eight fingers as well as her knees were noted to be tender without synovitis.[1] She was noted to have 12/18 fibromyalgia tender points, although 24 finger joints, 2 knee joints and two areas of the chest were marked; therefore, it is unclear which were considered fibromyalgia tender points.

---

[1]Synovitis is an inflammation of the joint lining, called synovium.

Dr. Lindsley reviewed x-rays from September 2009 and a joint survey from August 2007 and noted mild degenerative disc disease at C5 and C6, mild osteoarthritis, early osteoarthritis of the knees and early degenerative changes on the medial compartment of the right knee. Plaintiff had x-rays of her pelvis due to complaints of left hip pain (Tr. at 494). Radiologist Gary Hinson, M.D., noted "mild progression of moderate osteoarthritis of the left hip". Plaintiff had small bone cysts on the femoral head/neck junction which appeared "unchanged" from her prior scan. Sacroiliac joints were normal. Dr. Lindsley assessed polyarthralgias for which he told plaintiff to continue Tramadol. He assessed fibromyalgia. "Doing poorly. Try gabapentin [also called Neurontin, treats nerve pain] since pt has never been on this before. Titrate off Norflex [muscle relaxer], continue Flexeril [muscle relaxer] and Tramadol [same medication prescribed for polyarthralgias]. Encouraged exercise as tolerated." He assessed generalized osteoarthritis in the knees, spine and feet and told plaintiff to continue Tramadol for this impairment as well. He assessed sleep disturbance. "Stressed sleep hygiene." He prescribed Amitriptyline for that. He assessed tobacco abuse. "Encouraged to quit smoking. Pt states that she is not ready." He told her to return in six months for a routine follow-up.

On March 26, 2010, plaintiff was seen by Dr. Lindsley (Tr. at 490-493). She reported that her pain was an 8, her fatigue was a 7, and she was "very dissatisfied." She complained of malaise and fatigue, joint and muscle pain, and generalized aching. On exam she was alert, oriented, and cooperative. Her mood, affect, memory, judgment and insight were all normal. On examination, no tenderness was noted except in her hips. She was assessed with bilateral hip pain and was provided with methylprednisone injections with lidocaine.

On September 14, 2010, plaintiff saw Dr. Lindsley for left elbow pain for the past two months and parasthesia (Tr. at 501-504). Plaintiff had elbow tenderness on palpation, but no

other joint pain or swelling. She did report generalized stiffness. Plaintiff reported she had tried Lyrica in the past for fibromyalgia but did not like it due to weight gain. Plaintiff described her pain as an 8.5 and her fatigue as an 8. In a review of systems, plaintiff denied headaches, cough, and muscle pain. She reported fatigue, joint pain, generalized aching, and stiffness. No psychiatric symptoms were reviewed, but plaintiff was observed to be alert, oriented, and cooperative with normal mood, affect, memory, judgment and insight. Plaintiff's lungs were clear to auscultation. She had normal range of motion in her upper and lower extremities. Her gait and station were normal, she had normal strength in all of her extremities. She was noted to have 11 out of 18 fibromyalgia tender points. Knee x-rays showed "early" osteoarthritis of the left knee. Dr. Lindsley assessed left elbow pain/tendinitis, epicondylitis (tennis elbow), carpel tunnel syndrome "early sensory involvement" without motor involvement, osteoarthritis "asymptomatic," and fibromyalgia. He prescribed Naproxen (non-steroidal anti-inflammatory) twice a day for 2 weeks and then as needed. He prescribed Savella (treats depression) and continued plaintiff's Neurontin and Amitriptyline, all for fibromyalgia.

On October 29, 2010, plaintiff saw Dr. Wortham and complained of tightness in her chest and middle back which she rated a 7 out of 10 (Tr. at 510-512). Plaintiff reported increasing problems with shortness of breath on exertion, such as walking up a flight of stairs. On exam plaintiff's lungs were clear bilaterally to auscultation with no wheezes, rales or rhonchi. She was assessed with acute bronchitis. Spirometry in the office showed evidence of obstructive pulmonary disease. Chest x-rays showed right middle lobe pneumonia (Tr. at 509). Dr. Wortham prescribed antibiotics.

On November 29, 2010, plaintiff saw Dr. Wortham for a follow up (Tr. at 513-516). Plaintiff complained that she continued to cough and had suffered with a cough for years. She

said she did not feel good and would tire easily. She reported shortness of breath with walking for one minute. "She is disabled for 7 years now and wants to find out about her lung condition. She is a smoker and her last FEV1[2] was 33." Plaintiff continued to smoke a pack of cigarettes per day. "Patient has been counseled to quit." On exam she had decreased breath sounds bilaterally. "Probable COPD with an FEV1 of 34. She could not tolerate any maintenance meds including Advair or Spiriva.[3] Will obtain CT chest to rule out any other abnormalities of her lung. Advised her to quit smoking." Chest x-rays were normal. Oxygen saturation levels were normal. Dr. Wortham prescribed Combivent inhaler and prednisone, a steroid.

On December 3, 2010, plaintiff had an echocardiogram which showed everything normal except grade 1 diastolic dysfunction without elevated left atrial pressure[4] (Tr. at 536-537). That same day she had a CT of her chest which showed emphysematous[5] changes (Tr. at 517).

On December 8, 2010, plaintiff saw Savitri Manda, M.D., for a follow up on her chest CT (Tr. at 518-520). "Patient is a smoker." Plaintiff said she had been given Spiriva and had a

---

[2]A pulmonary function test. FEV1 is forced expiratory volume in 1 second. An FEV1 of 33 means severe COPD.

[3]I note that plaintiff was prescribed Spiriva in future records and there does not appear to be any medical evidence that she was ever not able to tolerate this medication.

[4]Diastolic dysfunction is an abnormality in the relaxation phase of the heart beat during which the heart is filling with blood in preparation for the next ejection. Based on findings measured by the echocardiogram, there are 3 grades: Grade 1 (mild), Grade 2 (moderate), and Grade 3 (severe). As we age, findings compatible with grade 1 are commonly observed. If there is no progression, Grade 1 is compatible with a normal life span and is usually reversible.

[5]Emphysema is a form of chronic (long-term) lung disease, usually caused by smoking. Because of lung damage, people with emphysema have difficulty blowing air out. The major symptom of emphysema is shortness of breath. In most people, symptoms of emphysema are slowly progressive. Emphysema symptoms also include cough and wheezing.

"severe allergic reaction" with it; however, the records show that she would be prescribed this medication in the future and would have no difficulty tolerating it. She had been using her Combivent inhaler regularly "and it seems to work slightly." Plaintiff said her cough and chest tightness had decreased since she started using Combivent. Plaintiff had hyperlipidemia and elevated blood pressure, but she was not on any medication for her cholesterol and was not checking her blood pressure at home. "Patient has fibromyalgia and is on several medications but she states that nothing is working for her pain. Because of the pain she is not able to cook and eats all the junk food [and] does not eat healthier [or] exercise." Plaintiff continued to smoke a pack of cigarettes per day. "Patient has been counseled to quit." On exam she had decreased breath sounds bilaterally and was observed to have a depressed affect. Dr. Manda went over plaintiff's CT scan with her and "advised patient to quit smoking. Patient is not ready for that yet." Dr. Manda gave plaintiff some samples of Advair and told her to continue using her rescue inhalers as needed. She was prescribed Propranolol for "elevated blood pressure without diagnosis of hypertension" although she had been prescribed this for migraine headaches in the past. She was assessed with shortness of breath and was told to "quit smoking."

On February 7, 2011, plaintiff saw Dr. Manda for a follow up (Tr. at 522-525). Plaintiff complained of continued shortness of breath with climbing stairs. Plaintiff had been using Advair, Combivent and Albuterol and noticed only mild improvement in her lung function. "She is under a lot of stress and not able to quit smoking. She has tried Wellbutrin and thinks that she is allergic to it. She has not tried Chantix." Plaintiff also complained of waking up at night with wheezing and shortness of breath. Plaintiff said she could not afford to see her rheumatologist anymore. "She wants me to give her refills on her meds. She has fibromyalgia and DJD [degenerative joint disease] and pains all over her body." Plaintiff said

she was depressed. Plaintiff continued to smoke a pack of cigarettes per day. "Patient has been counseled to quit." On exam plaintiff was noted to be anxious and crying. She had bilateral decreased air entry and expiratory wheezing. She had no joint swelling or tenderness but "several tender points on her lower and upper back." Pulmonary function testing improved 11% after medication. Dr. Manda prescribed Spiriva and discontinued Combivent. Plaintiff's oxygen saturation level went from 98% at rest to 91 and 91% with ambulation. Dr. Manda recommended a home-health overnight oximetry evaluation. He gave her samples of Lipitor for her high cholesterol. He assessed major depression and noted that she was taking Savella and tolerating it well. "Encouraged her to go for psychological counseling."

On February 17, 2011, plaintiff had an at-home overnight oximetry test conducted on room air (Tr. at 526-527). Her oxygen saturation level dropped below 89%[6] for a total of 8 seconds during the study which was 7 hours, 45 minutes and 24 second long. The lowest her oxygen saturation level dropped was 88%. Her average level was 93.2%.

On May 4, 2011, plaintiff saw Gerald Kerby, M.D., a pulmonary specialist (Tr. at 576-577). Plaintiff reported tiredness, fatigue and shortness of breath since about 2004. Plaintiff denied significant cough or wheezing, but did report chronic chest aching and discomfort. Plaintiff was using Chantix and reported reducing her smoking to about 2 cigarettes a day. "PA and lateral chest x-ray were obtained and appear normal. Report of a prior CT scan in November 2010 indicates the presence of mild pulmonary emphysema." Plaintiff's pulmonary function tests were "within normal limits with borderline obstruction."

> In summary, Mrs. Cypret appears to have mild chronic obstructive pulmonary disease with an element of emphysema reported on CT scanning. This appears to be reasonably well controlled on the Advair and Spiriva. I do not think that her lung disease explains her severe exertional dyspnea. This appears to be largely secondary to severe muscle

---

[6]When oxygen saturation on room air drops below 89%, supplemental oxygen is needed.

deconditioning, which is caused by the chronic muscle pain and arthritis, which prevents her from exercising and leads to a sedentary lifestyle. . . .

She was advised to continue her current medication, although I am not sure that she needs all that she is on and perhaps Spiriva alone with rescue albuterol would be adequate. She obviously would benefit from smoking cessation. The solution to her problem would revolve around being able to use her muscles for exercise to recondition them to where she can tolerate activity without symptoms due to muscle deconditioning. Weight loss would also be beneficial.

June 30, 2011, is plaintiff's last insured date.

On August 10, 2011, plaintiff had a pulmonary function test done at St. Luke's Hospital at the request of the ALJ (Tr. at 343, 541). FEV1 was 66 before bronchodilator and 76 after, indicating "moderate obstructive airways disease." On November 29, 2010, Dr. Wortham had noted that on plaintiff's last pulmonary function test, her FEV1 had been 33 which indicates severe COPD; therefore, plaintiff's pulmonary function test on this day showed improvement.

On August 13, 2011, plaintiff was examined by John Bleazard D.O., an orthopedic specialist, at the request of the ALJ (Tr. at 351-355, 549-553). Plaintiff reported suffering from low back pain and left forearm pain since 2003 when a shelf fell on her from "approximately six stories . . . above and landed and hit her on the head". Plaintiff participated in physical therapy and eventually had carpal tunnel syndrome surgery and surgery on her left ulna as a result of this 2003 accident. Plaintiff reported having been diagnosed with rheumatoid arthritis, fibromyalgia, and osteoporosis. Plaintiff was smoking a pack of cigarettes per day. Dr. Bleazard performed a physical examination and noted that plaintiff's effort was very poor due to pain but that it was "out of proportion to examination." Plaintiff had good range of motion in her arms. She had no pain on palpation to the bilateral shoulders, elbows, wrists or fingers and no joint swelling. She had a positive Hawkin's sign[7]

_____

[7]The Hawkins test is performed by elevating the patient's arm forward to 90 degrees while forcibly internally rotating the shoulder. Pain with this maneuver suggests subacromial

bilaterally.  Plaintiff had normal strength in her arms but decreased range of motion in her left wrist.  "The claimant was able to perform fine finger motor function including abduction and adduction of the fingers, extending the thumb and performing the okay sign without difficulty.  Plaintiff had normal range of motion in her legs and hips.  Knee and ankle motion was without pain but plaintiff had crepitus (a grinding sound) in both knees.  Her leg strength was 4/5.  Seated straight leg raising was negative but supine straight leg raising elicited pain in the lumbar region at 80 degrees bilaterally.  Plaintiff had no tenderness in her cervical, thoracic or lumbar spine but she had decreased forward bending.  She had no tenderness in her sacroiliac joints or greater trochanters.  Plaintiff's gait was normal; she was able to squat without limitation and she could heel/toe walk without difficulty.

Dr. Bleazard reviewed plaintiff's records from Dr. Lindsley for evaluation of fibromyalgia, osteoarthritis, GERD, migraines, and carpal tunnel syndrome; multiple internal medicine reports for evaluation of COPD, dyspnea and chronic cough; and radiology reports for pelvic x-ray revealing moderate left hip osteoarthritis.  Dr. Bleazard assessed "subjective low back pain with left lower extremity radiculopathy likely degenerative disc disease" and "polyarthralgia involving bilateral knees, hips, and shoulders likely osteoarthritis.  No records indicative of rheumatoid arthritis.  No serological studies suggesting rheumatoid arthritis."  Dr. Bleazard stated the following with respect to plaintiff's abilities:

1.      Sitting:  In my opinion, the claimant can sit 6 hours in a typical 8 hour workday with normal breaks and periodic alternating between sitting/standing for pain relief. There was no difficulty in her ability to sit for the majority of our 30 minute interview.

2.      Standing/Walking:  In my opinion, the claimant can stand/walk 4 hours in a typical 8 hour workday with normal breaks and occasional alternating between

impingement or rotator cuff tendinitis.

sitting/standing for pain relief. There was no difficulty in her ability to stand from a seated position and get onto/off of the exam table.

3.      Lifting:  In my opinion, lifting should be restricted to 30 pounds occasionally from floor to bench height with proper lifting mechanics.

4.      Carrying:  In my opinion, no more than 20 pounds occasionally for short distances or 10 pounds frequently.

5.      Handling/Fingering objects:  No restrictions.

6.      Hearing/speaking:  No restrictions.

7.      Travel:  No restrictions.

On September 3, 2011, Dr. Bleazard completed a medical source statement physical (Tr. at 356-361, 554-561).  He found that plaintiff could lift up to 10 pounds continuously (defined as over 2/3 of the time), 11 to 20 pounds frequently (1/3 to 2/3 of the time), and 21 to 50 pounds occasionally (up to 1/3 of the time).  He found that she could carry up to 10 pounds frequently and up to 20 pounds occasionally.  He found that plaintiff could sit for 2 hours at a time and for a total of 5 hours per day, which conflicts with his report indicating that plaintiff could sit for 6 hours per day.  He found that plaintiff could stand for 3 hours at a time and for a total of 4 hours per day.  He found that plaintiff can walk for 3 hours at a time and for a total of 4 hours per day.  He found that she could frequently reach in all directions, handle, finger and feel and that she could occasionally push and pull.  She could operate food controls frequently.  She could occasionally climb stairs and ramps; she could never climb ladders or scaffolds, balance, stoop, kneel, crouch or crawl.  He found that she could occasionally be exposed to moving mechanical parts, operation of a motor vehicle, humidity wetness, dust, odors, fumes, and pulmonary irritants, but that she could never be exposed to unprotected heights, extreme cold, extreme heat, or vibrations.

In his Range of Motion Values chart, he noted that plaintiff's effort was good and that her left palmar flexion, left radial deviation, left dorsiflexion and left ulnar deviation were somewhat reduced. All other range of motion values were normal. He found that she had 5/5 muscle strength in her legs, which conflicts with his report which indicated 4/5 muscle strength; however, in less than a month plaintiff would visit the emergency room and her strength would be assessed at 5/5 by the emergency room doctor.

On September 30, 2011, plaintiff was seen in the emergency room at St. Mary's Medical Center complaining of right sided chest pain and shortness of breath (Tr. at 596-609). "Pt states sudden onset today while taking grandchild to school. . . . Was getting into car, sudden stabbing pain." Plaintiff said she was struggling to take deep breaths, and when she tried to take a deep breath her pain would increase. "Patient has history of similar symptoms and was diagnosed with pneumonia. Patient currently smokes. Patient has no other complaints." She continued to smoke a pack of cigarettes per day. Plaintiff's medications included inhalers and Gabapentin and Propranolol. During a review of systems, plaintiff denied headaches. Plaintiff weighed 165 pounds. On exam plaintiff had diminished breath sounds at bases bilaterally but no respiratory distress and no wheezing. Plaintiff had tenderness to palpation in her back on her right side. Plaintiff had full range of motion in all of her extremities, her motor function was 5/5, she was alert and oriented times three with normal mood and affect. Plaintiff was given morphine and Vicodin (both narcotics) while in the emergency room. Chest x-rays and a CT scan were obtained. EKG was normal. Plaintiff was assessed with chest pain. Her symptoms improved while in the emergency room and she was told to follow up with her primary care physician in three to five days. She was given a prescription for Vicodin (20 pills) and an inhaler.

On October 12, 2011, plaintiff saw Dr. Wortham to follow up on her emergency room visit (Tr. at 614-617). Her main complaint continued to be shortness of breath. "She has a history of COPD and was evaluated by pulmonary at KU Medical Center. Workup at that time consisted of pulmonary function tests which despite her 30 year smoking history revealed relatively normal findings. She is currently being reasonably well-controlled with Advair and breathing inhalers." Plaintiff weighed 170 pounds. Plaintiff continued to take Imitrex, Propranolol and Tramadol as needed for "migraine not otherwise specified". The Tramadol was also being used, along with Orphenadrine (skeletal muscle relaxer) to treat her fibromyalgia. Plaintiff was told to continue on all of her current medications and to return in two to three months.

## C.    *SUMMARY OF TESTIMONY*

During the July 6, 2011, hearing, plaintiff testified. During the follow-up December 9, 2011, hearing plaintiff testified, and Stella Doering, a vocational expert, testified at the request of the ALJ.

### 1.    Plaintiff's testimony.

During the first hearing, plaintiff was 49 years of age (Tr. at 30). She was 5'6" tall and weighed 150 pounds (Tr. at 30). She has a 9th grade education and does not have a GED (Tr. at 30). After plaintiff stopped working at the Link, she worked for a temporary place called Labor Ready (Tr. at 31). She worked there for a month or two cleaning hotel rooms and sweeping at Wal-Mart (Tr. at 32). She worked 3 or 4 hours a day (Tr. at 32). This was after her alleged onset date (Tr. at 31). I note that in a Disability Report plaintiff stated that she was working 6 hours a day once a week.

Plaintiff lives in a one-level house with her husband, her 23-year-old son, and her son's girl friend (Tr. at 37). Her son's girl friend does the cooking, cleaning and shopping (Tr. at 37,

39). Plaintiff's husband does the laundry (Tr. at 37). Plaintiff gets tired taking a shower and washing her hair so she only showers once or twice a week (Tr. at 37-38). After showering, plaintiff sits on the edge of her bed for up to an hour to rest, and she "takes a couple squirts" of her medicine (Tr. at 38).

Plaintiff cannot work because she has arthritis in her knees, ankles and back (Tr. at 32). Her fibromyalgia pain causes headaches which keep her homebound (Tr. at 32). She gets these migraine headaches 4 or 5 times a month and they last a week or more (Tr. at 32). She also suffers from dizziness, confusion and pain in every joint from fibromyalgia (Tr. at 32-33). Plaintiff's back pain prevents her from bending over or squatting (Tr. at 33). Plaintiff's arthritis makes it hard for her to stand and walk (Tr. at 33). Plaintiff sometimes cannot walk even a block due to chronic obstructive pulmonary disease (Tr. at 33). She can only stand for 10 or 15 minutes and then she gets irritated (Tr. at 33).

Plaintiff has no cartilage in her knees, ankles, wrists, elbows or neck (Tr. at 34). She can lift a maximum of less than 5 pounds with her left hand, and she has difficulty turning a car steering wheel (Tr. at 34). She can pick up 5 to 10 pounds with her right hand, but it hurts (Tr. at 34). Plaintiff had surgery on her left arm -- the doctor had to break her bone and put it back into position (Tr. at 34-35).

Plaintiff is often short of breath due to chronic obstructive pulmonary disease (Tr. at 35). She takes a nap every day for 1 to 3 hours (Tr. at 35). She goes to bed at 8:00 p.m. but she wakes up throughout the night until she gets up around 8:00 or 9:00 a.m. (Tr. at 36). Out of that 12 to 13 hours in bed every night, plaintiff only sleeps about 4 hours total (Tr. at 36). Plaintiff is awakened at night due to tense muscles, cramping and coughing (Tr. at 36).

Plaintiff cannot walk and carry any weight at all because she would be out of breath (Tr. at 38). She can sit for a half hour at the most, and then her back and legs begin to ache (Tr. at 38). Getting up from a seated position is difficult for her (Tr. at 38).

Plaintiff's medications caused her to be dizzy, confused, sleepy, and nauseated (Tr. at 36). Her pain medications make her groggy and she loses track of time (Tr. at 36). She takes that medication 3 times a day (Tr. at 36). Plaintiff's biggest impediment to working is "the huffing and puffing and trying to walk." Plaintiff smokes a pack and a half of cigarettes per day despite having been advised to stop (Tr. at 39).

On a typical day, plaintiff sits and watches television and talks to her son's girl friend (Tr. at 38). She has no social activities outside the house (Tr. at 38).

During the second hearing, plaintiff testified that she had been examined by John Bleazard, D.O., at the request of the ALJ after the first hearing (Tr. at 44). She said she was in the examining room for "ten minutes at the most" (Tr. at 44). He told her to squat and she said she couldn't "and he said just go down as far as you can" and she did (Tr. at 44). She needed help getting back up (Tr. at 45). He did not ask her to make an "ok" sign with either hand (Tr. at 45). He ran his finger down her back, which only took a second, and that is the only examination he did of her back (Tr. at 45).

Plaintiff went to the emergency room a couple months earlier due to severe chest pains (Tr. at 45). This happens regularly, two to five times a day (Tr. at 45). She went to the emergency room that day because the pains were more severe (Tr. at 45). When she has chest pain, she curls up until she goes to the hospital and they give her something to control it (Tr. at 46). When she does not go to the hospital, she lies down for "a good day or more" to wait for the chest pain to subside (Tr. at 46). About ten times a month plaintiff will have chest pain that requires her to lie down for a day or more (Tr. at 46). This chest pain began about four or five

months before the second administrative hearing, or approximately July or August of 2011 (the first administrative hearing was on July 6, 2011) (Tr. at 46).

## 2. Vocational expert testimony.

Vocational expert Stella Doering testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes semi-skilled work as a file clerk and unskilled work as a marker which was a retail job (Tr. at 47-48).

The first hypothetical involved someone who could lift and carry the following weight:

Lift:  10 pounds continuously, 20 pounds frequently, 50 pounds occasionally

Carry:  10 pounds frequently, 20 pounds occasionally

(Tr. at 48). The person could sit for 5 hours per day and for 2 hours at a time, stand for 4 hours per day and for 3 hours at a time, and walk for 4 hours per day and for 3 hours at a time (Tr. at 48). The person could frequently reach overhead in all directions, handle, finger, and feel. The person could occasionally push and pull but could frequently use his feet for foot controls. The person could occasionally climb stairs or ramps but could never climb a ladder or a scaffold. The person could never balance, stoop, kneel, crouch, crawl, or be exposed to unprotected heights. The person could occasionally be exposed to moving mechanical parts; operate a motor vehicle; be exposed to humidity, wetness, dust, odors, fumes, and pulmonary irritants. The person could never be exposed to extreme cold, heat or vibrations. The person could be exposed to a moderate level of office noise. The person could understand and remember simple instructions to complete simple one- and two-step tasks (Tr. at 48-49).

The vocational expert testified that such a person could not perform any of plaintiff's past relevant work (Tr. at 49). The person could, however, perform some unskilled light and sedentary level work (Tr. at 49). For example, the person could work as a ticket printer and tagger in the garment industry, DOT 652.685-094, with 715 in Missouri and 13,400 in the

24

country, or a router, DOT 222.587-038, with 1,500 in Missouri and 62,500 in the country -- both light jobs (Tr. at 50).

The second hypothetical was the same as the first except the person could only pick up 5 pounds with his left hand and 5 to 10 pounds with his right hand; walk a half to one block; carry nothing while walking; sit for 30 minutes at a time; stand for 10 to 15 minutes at a time; would require a daily nap for 1 to 3 hours; would be dizzy, confused, sleepy and nauseated sometimes due to medication; would not be able to keep track of what he was doing after taking medication; and would need to take a 30- to 60-minute break after engaging in minor exertional activity (Tr. at 50-51). The vocational expert testified that such a person could not work (Tr. at 51). The need to nap for up to 3 hours daily would preclude all work, and the inability to concentrate on work for extended periods of time due to medication would preclude all work (Tr. at 51).

## V.   *FINDINGS OF THE ALJ*

Administrative Law Judge Evelyn Gunn entered her opinion on December 20, 2011 (Tr. at 11-20). Plaintiff's last insured date was June 30, 2011 (Tr. at 13).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 13). She worked after her alleged onset date but she did not earn enough to constitute substantial gainful activity (Tr. at 13).

Step two. Plaintiff has the following severe impairments: mild degenerative disc of the lumbar spine, fibromyalgia, osteoarthritis, moderate obstructive airway disease, and depression (Tr. at 13). "Without reviewing each impairment separately, they are at least severe in combination and have been factored into the residual functional capacity below." (Tr. at 14).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14-15).

Step four.  Plaintiff retains the residual functional capacity to lift and carry 10 pounds

continuously, 20 pounds frequently, and 50 pounds occasionally; sit for 2 hours at a time and

for a total of 5 hours per workday; and stand or walk each for 3 hours at a time and for a total

of 4 hours per workday.  She can frequently reach, handle, finger and feel with both hands.

She can occasionally push and pull. She can frequently use foot controls. She can occasionally

climb stairs and ramps but she may never climb ladders or scaffolds. She can never balance,

stoop, kneel, crouch or crawl. She can never be exposed to unprotected heights, extreme cold

or heat or vibration. She can occasionally be exposed to moving mechanical parts, humidity

and wetness, dust, odors, fumes and pulmonary irritants. She can occasionally operate a

moving vehicle. She can be exposed to no more than moderate noise levels in the workplace.

She can understand and remember simple instructions to complete simple 1- or 2-step tasks

(Tr. at 15).  With this residual functional capacity plaintiff is unable to perform past relevant

work as a file clerk or retail marker (Tr. at 18).

Step five.  Plaintiff is capable of performing other jobs available in significant numbers

such as ticket printer and tagger or router (Tr. at 18-19).  Therefore, plaintiff was found not

disabled from her alleged onset date to her date last insured (Tr. at 19-20).

## VI.    STANDARD OF PROOF

Plaintiff's first argument is that the ALJ committed reversible error by holding plaintiff

to a higher standard of proof than the law requires.  "The ALJ stated the RFC was supported by

a 'preponderance of the objective and subjective evidence.' This is not the correct legal

standard. The correct legal standard is 'substantial evidence.' 'Substantial evidence' is less than

a preponderance.  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008)."  Plaintiff's

argument is without merit.

Title 20, Code of Federal Regulations, Section 404.953(a) provides the standard that must be applied by an administrative law judge: "The administrative law judge must base the decision on the preponderance of the evidence offered at the hearing or otherwise included in the record." The case cited by plaintiff in her brief describes the standard of review used by federal courts in determining whether to uphold an ALJ's decision. It does not provide the standard that must be followed by an ALJ.

## VII.    RESIDUAL FUNCTIONAL CAPACITY

Plaintiff next argues that the ALJ erred in assessing plaintiff's residual functional capacity by (1) relying on plaintiff's part-time job, (2) finding that plaintiff had mild difficulties in maintaining social functioning but failing to include any limitations based on that finding, (3) relying on the fact that no treating physician had found that plaintiff would be incapable of working based on her impairments, (4) in finding that plaintiff's fibromyalgia is a severe impairment but also pointing out that there are no objective medical findings supporting this diagnosis, (5) in finding that plaintiff's spirometry report showed no severe breathing difficulties when the report specifically noted moderate obstructive airway disease with no response to bronchodilators, (6) in finding plaintiff not credible when she said she had no cartilage in her joints, (7) in adopting the opinions of Dr. Bleazard who found that plaintiff must alternate sitting and standing but not including this limitation in plaintiff's residual functional capacity assessment, and (8) in relying on Dr. Bleazard's opinion at all since it was internally inconsistent.

A residual functional capacity assessment is based on all the evidence of record, not just medical evidence. Although the residual functional capacity formulation is a part of the medical portion of a disability adjudication (as opposed to the vocational portion), it is not based only on "medical" evidence, i.e., evidence from medical reports or sources; rather an ALJ

27

has the duty to formulate residual functional capacity based on all the relevant, credible evidence of record. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) ("[I]n evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively.") (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)); Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved only by medical evidence, we disagree."); see also 20 C.F.R. §§ 404.1545 and 416.945; SSR 96-8p.

**Fibromyalgia.**

In her order, the ALJ stated as follows: "Based on the hearing testimony and medical evidence," plaintiff's fibromyalgia causes more than minimal limitations in her ability to perform basic work activities and is therefore severe (Tr. at 13-14). The ALJ considered both the medical evidence, which she observed included medical records assessing fibromyalgia but failing "to identify specific objective findings or physical examinations that were conducted to confirm this diagnosis." She also noted that plaintiff's most recent treatment notes identify "fibromyalgia but only by history."

Plaintiff's alleged onset date is February 1, 2009. A month and a half later, she saw Dr. Lindsley, her rheumatologist, who assessed fibromyalgia without noting any tender points or any other findings to support that diagnosis. No treatment was provided for fibromyalgia -- he prescribed medication for GERD and restless legs. This was despite plaintiff describing her pain as an 8.5 out of 10, and her fatigue a 10 out of 10, which, according to the Visual Analogue Scale, is the "worst possible, unbearable, excruciating." Six months later, plaintiff saw her rheumatologist and described her pain and fatigue both a 9 out of 10 and her "global" as a 10 out of 10 -- worst possible, unbearable, excruciating. Her muscle strength was normal; gait and station were normal. She had 16 of 18 tender points, but they were not

identified.  This time he prescribed a muscle relaxer, non-narcotic pain medication, and a skeletal muscle relaxer and told her to return in six months.

On March 1, 2010, plaintiff saw Dr. Wortham and denied fatigue, weakness, malaise, muscle cramps, muscle weakness, loss of strength, sleep disorder, difficulty with concentration, memory loss, anxiety, and mental problems.  Two weeks later plaintiff saw her rheumatologist and described her pain and fatigue as an 8 out of 10, despite having denied fatigue two weeks earlier when seeing Dr. Wortham.  The rheumatologist assessed fibromyalgia, prescribed medication, told plaintiff to exercise, and recommended she return for a follow-up in six months.  Ten days later she returned.  She described her pain as an 8 and her fatigue as a 7.  No tenderness was noted except in her hips.  She was assessed with bilateral hip pain and was given hip injections.  Six months later she saw the rheumatologist and had 11 tender points, all unidentified.  She had normal range of motion and normal strength; her osteoarthritis was noted to be asymptomatic.  She described her pain as an 8.5 out of 10.  A couple months later, plaintiff told another doctor that her fibromyalgia medication was not working, and because she was still in pain she did not cook and instead ate "all the junk food" and did not exercise, and she continued to smoke against medical advice.  She said she needed medication for fibromyalgia and could not afford to see her rheumatologist anymore.  This doctor noted "several tender points on her lower and upper back" -- she was encouraged to get counseling.  Fibromyalgia was not mentioned again for another eight months when plaintiff saw her doctor for a follow up on an emergency room visit for chest pain.  This doctor merely mentioned that plaintiff was on medication for fibromyalgia.  There are no other treatment records for fibromyalgia; no other tests substantiating the diagnosis of fibromyalgia.

Although plaintiff consistently described her pain as almost as bad as any pain can be, she was treated consistently and conservatively, she almost never saw a doctor outside of the

normal twice-a-year follow-up appointment schedule, and her medications remained relatively stable with little change indicating her treating doctors believed her treatment was adequately controlling her symptoms. Her doctor never recommended (or observed) any difficulty with any physical or mental ability. In fact, plaintiff was told to exercise.

The ALJ did not rely solely on the objective medical evidence. The ALJ specifically stated that she based her residual functional capacity assessment on the hearing testimony (in which plaintiff described severe, debilitating pain and fatigue) and the medical/opinion evidence, described above. The ALJ's finding, after considering all of this evidence, was that plaintiff's fibromyalgia caused more than a minimal effect on plaintiff's ability to do basic work activities. This was a finding at step two of the sequential analysis.

The finding at step four requires that the ALJ assess the claimant's residual functional capacity, i.e., the most that a claimant can do. The ALJ did in fact limit plaintiff's lifting, walking, standing, sitting, pushing, pulling, climbing, balancing, stooping, kneeling, crouching, and crawling, which indicates that she did give plaintiff the benefit of the doubt with respect to having some limitation despite the medical record not providing much if any support for those limitations.

**Osteoarthritis.**

Plaintiff disagrees with the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not credible based in part on the ALJ's statement that "she testified she had no cartilage in any of her joints, when there is no objective evidence of this in the record." Plaintiff argues that osteoarthritis causes a wearing away of the cartilage.

Plaintiff is correct that osteoarthritis includes a wearing away of the cartilage in joints:

Osteoarthritis is the most common form of arthritis, affecting millions of people around the world. Often called wear-and-tear arthritis, osteoarthritis occurs when the protective cartilage on the ends of your bones wears down over time.

30

While osteoarthritis can damage any joint in your body, the disorder most commonly affects joints in your hands, neck, lower back, knees and hips.

Osteoarthritis gradually worsens with time, and no cure exists. But osteoarthritis treatments can slow the progression of the disease, relieve pain and improve joint function. . . .

Osteoarthritis occurs when the cartilage that cushions the ends of bones in your joints deteriorates over time. Cartilage is a firm, slippery tissue that permits nearly frictionless joint motion. In osteoarthritis, the slick surface of the cartilage becomes rough. Eventually, if the cartilage wears down completely, you may be left with bone rubbing on bone. . . .

Osteoarthritis is a degenerative disease that worsens over time. Joint pain and stiffness may become severe enough to make daily tasks difficult. Some people are no longer able to work. When joint pain is this severe, doctors may suggest joint replacement surgery. . . .

http://www.mayoclinic.org/diseases-conditions/osteoarthritis

In March 2010, plaintiff saw Dr. Lindsley who noted *mild* degenerative disc disease at C5 and C6, *mild* osteoarthritis, *early* osteoarthritis of the knees and *early* degenerative changes on the medial compartment of the right knee. Plaintiff had x-rays of her pelvis due to complaints of left hip pain which showed mild progression of moderate osteoarthritis of the left hip. In September 2010, knee x-rays showed early osteoarthritis of the left knee, and Dr. Lindsley noted that plaintiff's osteoarthritis was "asymptomatic."

As a result of the medical records in this case, the ALJ concluded that plaintiff "greatly exaggerated" her symptoms and as an example cited plaintiff's testimony that she has no cartilage in any of her joints. Clearly the records which indicate "mild" osteoarthritis which is described as "asymptomatic" by her treating physician does not support plaintiff's statement that her cartilage is gone.

**Breathing.**

Plaintiff argues that the ALJ erred in finding that plaintiff's spirometry report showed no severe breathing difficulties when the report specifically noted moderate obstructive

airways disease with no response to bronchodilators.

First, I note that "impairments that are controllable or amenable to treatment, including certain respiratory problems, do not support a finding of disability; and failure to follow a prescribed course of remedial treatment, including the cessation of smoking, without good reason is grounds for denying an application for benefits." Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000); Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir.1997).

Second, I point out that plaintiff did cut down on her smoking at one point during this record, and her pulmonary function tests improved as a result. On November 29, 2010, plaintiff's FEV1 was 33, which indicated severe COPD. She was smoking at least a pack of cigarettes per day at the time. On August 10, 2011, plaintiff's FEV1 was 66, which indicated only moderate COPD. Earlier that year she had tried Chantix and had been able to reduce her smoking to two cigarettes per day. At that time she was noted to have mild COPD which was reasonably well controlled on medication. Despite being advised by all of her doctors to stop smoking, which would improve all of her medical conditions, and despite seeing the improvement during the time when she almost stopped smoking, plaintiff returned to smoking and at the time of the administrative hearing was up to a pack and a half a day.

**Dr. John Bleazard.**

Plaintiff argues that the ALJ erred in giving any weight to the opinion of Dr. Bleazard because his report was inconsistent with his medical source statement and because he claimed in his report to have performed much more substantial examination than plaintiff testified to during the hearing. Plaintiff also argues that the ALJ erred in adopting the opinion of Dr. Bleazard who found that plaintiff would need to sit and stand at will but the ALJ did not include this limitation in plaintiff's residual functional capacity.

"It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012), citing Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). In this case, the ALJ thoroughly discussed Dr. Bleazard's examination and findings and stated that his findings were "thorough and compatible with the evidence of record". She then stated that:

> In addition to Dr. Bleazard's examination, report, and opinion, . . . MRI studies of her thoracic spine showed no significant abnormality and no area of abnormal enhancement and studies of her lumbar spine did not reveal any significant abnormality or area of abnormal enhancement. The claimant has not had surgical intervention and none is scheduled.[8] X-rays of her knees showed early osteoarthritis of the left knee and mild early degenerative changes in the medial compartment of the right knee.

(Tr. at 17).

It is clear that the ALJ did not rely solely on the opinion of Dr. Bleazard. She considered all of the evidence of record, most of which was from plaintiff's treating sources, before determining plaintiff's residual functional capacity. That evidence included the following:

In March 2009, plaintiff described her pain as an 8.5 and her fatigue as a 10. In September 2009 she described her pain and fatigue both as 9 out of 10. In March 2010 she described them both as an 8 out of 10. In September 2010 her pain was an 8.5 and her fatigue an 8. Despite those very severe reports of pain and fatigue from plaintiff, her rheumatologist treated her condition conservatively and needed to see plaintiff no more frequently than twice a year.

In March 2009, Dr. Lindsley observed that plaintiff had normal mood, affect, memory, judgment and insight. He made the same findings in September 2009, March 2010,

---

[8]Although plaintiff argues that the ALJ was referring to plaintiff's fibromyalgia when she wrote this, it is clear that the ALJ was referring to plaintiff's spine condition, not her fibromyalgia.

September 2010.  Dr. Aram found that plaintiff had only mild difficulties in maintaining concentration, persistence or pace, but no other mental limitations.

Thirteen months after her alleged onset date, plaintiff saw Dr. Wortham and denied fatigue, weakness, malaise, muscle cramps, muscle weakness, loss of strength,  sleep disorder, difficulty with concentration, memory loss, anxiety, and mental problems.  Dr. Wortham observed that plaintiff was alert and cooperative with normal mood and affect, normal attention span, normal concentration.

Plaintiff was advised by nearly every doctor to stop smoking and to exercise.  Dr. Kerby's opinion was that if plaintiff would exercise, her muscles would be reconditioned so that she could tolerate activity without symptoms.  He indicated she should stop smoking and that weight loss would be beneficial.

Plaintiff never sought medical attention for headaches (migraine or otherwise) after her alleged onset date.

Plaintiff argues that the ALJ said she adopted the opinion of Dr. Bleazard but then did not include in the residual functional capacity the sit/stand option recommended by Dr. Bleazard.  Dr. Bleazard mentioned changing positions from sitting to standing; however, he ultimately found that plaintiff could sit for two hours at a time which the ALJ included in her residual functional capacity assessment.  Plaintiff's other arguments with respect to the residual functional capacity determination are without merit.  The ALJ adequately discussed the medical evidence, her credibility determinations are supported by the record, and her residual functional capacity assessment is based on the substantial evidence in the record as a whole.

*VIII.*    *THIRD PARTY STATEMENTS*

Plaintiff argues that the ALJ erred in failing to consider the third-party statements: "Third party testimony has direct bearing on the credibility determination to be made by the ALJ. . . [and] is also crucial in the proper assessment of the Plaintiff's RFC."

Social Security Ruling (SSR) 06-3p clarifies how the Social Security Administration considers opinions from sources who are not what the agency terms "acceptable medical sources." SSA separates information sources into two main groups: "acceptable medical sources" and "other sources." It then divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007).

Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. §§ 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

1.      Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment. Id.

2.      Only acceptable medical sources can provide medical opinions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

3.      Only acceptable medical sources can be considered treating sources. 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. "Non-medical sources" include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors,

clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007). "Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. quoting SSR 06-3p.

The courts have consistently criticized the Social Security Administration for failing to discuss third-party statements:

> Where proof of a disability depends substantially upon subjective evidence, . . . a credibility determination is a critical factor in the Secretary's decision. Thus, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983). See also Andrews v. Schweiker, 680 F.2d 559, 561 (8th Cir. 1982).

Basinger v. Heckler, 725 F.2d 1166, 1170 (8th Cir. 1984).

However, the fact that the courts have made this criticism on a regular basis does not mean that in every case the failure of an ALJ to analyze the credibility of third-party witnesses remand is automatic. For example, in Young v. Apfel, 221 F.3d 1065 (8th Cir. 2000), the court held that the ALJ "implicitly" evaluated the testimony of the claimant and her witnesses by evaluating the inconsistencies between her statements and the medical evidence.

> [B]ecause the same evidence also supports discounting the testimony of Young's husband, the ALJ's failure to give specific reasons for disregarding his testimony is inconsequential. See Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir. 1995) (arguable failure of ALJ specifically to discredit witness has no bearing on outcome when witness's testimony is discredited by same evidence that proves claimant's testimony not credible). Finally, we find that the ALJ did not discredit the statements of Young's friends merely on the grounds that they were not medical evidence; rather, the ALJ observed that the statements were devoid of specific information that could contradict the medical evidence regarding Young's capabilities during the relevant time period.

Id. at 1068-1069.

See also Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996); Bates v. Chater, 54 F.3d 529, 533 (8th Cir. 1995).

In this case, third-party statements were completed by two of plaintiff's friends. Tonya Bryan-Long indicated that she sees plaintiff once a month. She indicated that plaintiff is up and down at night and that she does not have normal sleep, that she has a hard time getting out of the tub, that plaintiff's husband does all of the cooking or they eat out, that plaintiff is able to drive, that plaintiff's hobbies include reading a lot and watching television, and that plaintiff has a hard time getting along with co-workers because she "hurts too much." There is no indication in the form how Ms. Bryan-Long knows what goes on during the night or in plaintiff's bathroom -- she indicated that she sees plaintiff about once a month, that "now we hardly see each other. Talk on the phone some. . . . I miss her." The statement itself provides a basis for giving little weight to its contents as it is clear that Ms. Bryan-Long does not have first-hand knowledge of at least some of the substance of her report.

Georgina Phillips said she sees plaintiff "a couple weeks every other month." Ms. Phillips reported that plaintiff vacuums a couple times a week; however, plaintiff reported that she is not able to vacuum. Ms. Phillips said plaintiff helps her husband do the dishes, but plaintiff reported that she is unable to do any household chores other than wiping off the table. Ms. Phillips reported that plaintiff cooks a little bit, but plaintiff reported that she eats one meal a day which is prepared by her husband. And again, it is unclear how Ms. Phillips knows what she reported since seeing plaintiff "every other month" does not give her much of an opportunity to observe plaintiff's abilities. Finally, Ms. Phillips's statement does not really help plaintiff's case because she reported that plaintiff is able to do things that plaintiff denies being able to do.

In this case proof of plaintiff's disability does not depend substantially upon subjective evidence, and the unreliability of the third-party statements is evident; therefore, the ALJ's failure specifically to address each of these statements does not constitute reversible error. Basinger v. Heckler, 725 F.2d 1166, 1170 (8th Cir. 1984).

## IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.   Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 28, 2014